UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAY 26  A 8: 23

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| D.L. RYAN COMPANIES, LTD. | : | Civil Action |
| Plaintiff, | : | No. 3:03CV1037 (JCH) |
| V. | : | |
| ALTA HEALTH & LIFE INSURANCE COMPANY | : | |
| Defendant. | : | April 20, 2004 |

### AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF DEFENDANT ALTA HEALTH & LIFE INSURANCE COMPANY

### ANSWER

Defendant Alta Health & Life Insurance Company ("Alta" or "Defendant") hereby answers the paragraphs of the Amended Complaint, dated August 6, 2003 ("Complaint") of Plaintiff D.L. Ryan Companies, Ltd. ("Plaintiff") as follows:

1. Admitted.

2. Admitted.

3. Defendant admits that it engaged in business in Connecticut and entered into certain contracts with Plaintiff but denies that such contracts are accurately described in Plaintiff's Complaint or are the same as the "Agreement" described in the Complaint. Defendant declines to respond to the allegation that "there existed certain minimum contacts between the Defendant and this State" as that allegation calls for a legal conclusion. Defendant denies the remaining allegations of paragraph 3.

4. Defendant admits that it entered into certain contracts with Plaintiff, effective on or about January 1, 2000 as amended by replacement contracts effective January 1, 2002

(collectively referred to hereinafter as the "Contracts"), denies that the "Agreement" referred to in the Complaint accurately describes such Contracts, refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 4.

5. Defendant declines to respond to allegations concerning contracts or agreements between Plaintiff and Defendant but refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 5.

6. Defendant admits that Plaintiff paid $180,000 pursuant to a letter agreement dated April 10, 2000 (the "Letter Agreement") regarding a "Premium Stabilization Reserve," declines to respond to allegations concerning the terms of the Letter Agreement but refers the Court to the Letter Agreement for its terms and denies the remaining allegations of paragraph 6.

7. Defendant declines to respond to allegations concerning contracts or agreements between Plaintiff and Defendant but refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 7.

8. Defendant admits that an audit performed in 2001 based on calendar year 2000 indicated an "Experience Surplus" under the terms of a Stop Loss Contract in the amount of $39,849.00, admits that pursuant to the terms of the Stop Loss Contract as amended and restated by an Excess Loss Policy, Plaintiff received "Payable Experience Surplus" or "Creditable Experience Surplus" credits in the amount of $14,642.48 in 2001 and 2002 calculated from the "Experience Surplus" audit for 2000, denies that any further amount of the "Experience Surplus" is due and owing to Plaintiff, refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 8.

9. Defendant admits that an audit performed in 2002 based on calendar year 2001 indicated an "Experience Surplus" under the terms of a Stop Loss Contract in the amount of $61,898.65, admits that pursuant to the terms of the Stop Loss Contract as amended and restated by an Excess Loss Policy, Plaintiff received a "Creditable Experience Surplus" credit in the amount of $20,632.88 calculated from the "Experience Surplus" audit for 2001, denies that any further amount of the "Experience Surplus" is due and owing to Plaintiff, refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 9.

10. Denied.

11. Defendant admits it has not paid amounts demanded by Plaintiff, denies that it owes such amounts under the Contracts, declines to respond to allegations concerning the terms of any contracts or agreements between Plaintiff and Defendant but refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 11.

12. Denied.

13. Denied.

14. Denied.

15. Defendant admits that it ceased paying claims submitted by or on behalf of Plaintiff's employees, denies that such cessation breached any contract or agreement between Plaintiff and Defendant, declines to respond to allegations concerning the terms of any contracts or agreements between Plaintiff and Defendant but refers the Court to the Contracts for their terms and denies the remaining allegations of paragraph 15.

16. Denied.

17. Denied.

Second Count (Breach of the Implied Covenant of Good Faith and Fair Dealing)

    1-16.   Defendant realleges its answers to paragraphs 1 through 16 of the First Count as its answers to paragraphs 1 through 16 of the Second Count.

    17.   Denied.

    18.   Denied

Third Count (Unjust Enrichment and Restitution)

    1-17.   Defendant realleges its answers to paragraphs 1 through 17 of the First Count as its answers to paragraphs 1 through 17 of the Third Count.

    18.   Denied.

Fourth Count (Specific Performance and Injunction)

    1-17.   Defendant realleges its answers to paragraphs 1 through 17 of the First Count as its answers to paragraphs 1 through 17 of the Fourth Count.

    18.   Denied.

    19.   Denied.

Fifth Count (Common Law Conversion)

    1-17.   Defendant realleges its answers to paragraphs 1 through 17 of the First Count as its answers to paragraphs 1 through 17 of the Fifth Count.

    18.   Denied.

    19.   Denied.

Sixth Count (Statutory Theft)

    1-17.   Defendant realleges its answers to paragraphs 1 through 17 of the First Count as its answers to paragraphs 1 through 17 of the Sixth Count.

    18.   Denied.

19.  Denied.

Seventh Count (CUTPA)

1-17.  Defendant realleges its answers to paragraphs 1 through 17 of the First Count as its answers to paragraphs 1 through 17 of the Seventh Count.

18.  Defendant admits that it has engaged in business in the State of Connecticut, declines to respond to the allegation that such activity consists of "trade or commerce" as defined in Connecticut General Statutes § 42-110a(3) and (4) as the allegation states a legal conclusion and denies the remaining allegations of paragraph 18.

19.  Denied

20.  Denied.

## AFFIRMATIVE DEFENSES

**First Affirmative Defense, as to the First through Seventh Counts (Failure to state a claim upon which relief may be granted)**

The causes of action alleged in Plaintiff's Amended Complaint fail to state a claim upon which relief may be granted.

**Second Affirmative Defense, as to the First through Seventh Counts (Preemption by the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. §§ 1001 *et seq.*)**

The causes of action alleged by Plaintiff are preempted by the Employer Retirement Security Act ("ERISA"), codified at 29 U.S.C. §§ 1001 *et seq.*

**Third Affirmative Defense, as to the First through Seventh Counts (Plaintiff's prior material breaches of the pertinent contracts)**

Plaintiff is barred from pursuing its claims arising out of alleged breaches of contract due to Plaintiff's prior material breaches of the Contracts between Plaintiff and Defendant.

**Fourth Affirmative Defense, as to the First Through Seventh Counts (Unjust Enrichment)**

Plaintiff is barred from collecting the amounts its seeks from Defendant because any such recovery would unjustly enrich Plaintiff, which accepted and used all of the benefits provided by Defendant under the Contracts.

**Fifth Affirmative Defense, as to the First Through Seventh Counts (Waiver)**

Plaintiff has waived any right to claim amounts due under or breach of any contract or agreement with Defendant containing terms other than those contained in the Contracts by receipt and acceptance of the Contracts, acceptance and use of all of the benefits provided by Defendant under the Contracts and its failure to return signed, written Contracts to Defendant despite receiving signed Contracts from Defendant.

**Sixth Affirmative Defense, as to the First Through Seventh Counts (Estoppel)**

Plaintiff is estopped from claiming amounts due under or breach of any contract or agreement with Defendant containing terms other than those contained in the Contracts by receipt and acceptance of the Contracts, acceptance and use of all of the benefits provided by Defendant under the Contracts and its failure to return signed, written Contracts to Defendant despite receiving signed Contracts from Defendant.

## COUNTERCLAIM

**First Count (Breach of Contract)**

1.  The Plaintiff-in-Counterclaim, Alta Health & Life Insurance Company ("Alta") is a Colorado corporation with its primary office in Englewood, Colorado. Alta is engaged in the business, in Connecticut and other states, of providing, *inter alia,* excess loss insurance and claims processing and other administrative services to employers that self-insure employee health benefit plans.

2. The Defendant-in-Counterclaim, D.L. Ryan Companies, Ltd. ("D.L. Ryan"), is a Connecticut corporation with an office in Westport, Connecticut. For the period from January 1, 2000 through December 31, 2002, D.L. Ryan maintained a self-insured employee health benefits plan (the "Plan").

3. On or about November 22, 1999, Plaintiff submitted to Defendant a signed application for group coverage. A copy of the application is attached as Exhibit A.

4. Effective January 1, 2000 Plaintiff and Defendant entered into, *inter alia*, the following contracts:

    a. A Stop-Loss Contract ("Stop-Loss Contract") (a copy is attached as Exhibit B); and

    b. A Services Contract ("Services Contract").

The Stop-Loss Contract and the Services Contract are referred to collectively, at times, hereinafter as the "Initial Contracts."

5. In connection with the Initial Contracts, the Plaintiff and Defendant also entered into a letter agreement, dated April 10, 2000 (the "Letter Agreement"), regarding a "Premium Stabilization Reserve." The Letter Agreement concerned a reserve for terminal costs under the Initial Contracts, and provided, *inter alia*, that "[a]ll other provisions of the Stop Loss agreement are applicable to this agreement." A copy of the Letter Agreement is attached as Exhibit C.

6. Effective January 1, 2002, the Initial Contracts were amended and restated by the following:

    a. An Excess Loss Policy, which amended and restated the Stop Loss Contract (a copy is attached as Exhibit D); and

7

b.  An Administrative Services Contract, which amended and restated the Initial Administrative Services Contract (a copy is attached as Exhibit E).

The Excess Loss Policy and the amended and restated Administrative Services Contract are referred to collectively, at times hereinafter, as the "Contracts."

7. The primary purpose of the amendment and restatement of these contracts was to update them to include new plan designs and clarify certain provisions. See January 29, 2002 cover letter transmitting the Contracts to Plaintiff (a copy is attached as Exhibit F).

8. The January 29, 2002 cover letter to Plaintiff provided that "your first payment will be considered your acceptance of these new contracts and policies."

9. During the balance of the calendar year 2002, after its receipt of the January 29, 2002 cover letter, Plaintiff continued to use and pay for Defendant's services pursuant to the Administrative Services Contract, as amended, and continued to benefit from and pay for insurance coverage provided by the Excess Loss Policy.

10. Plaintiff never indicated to Defendant that it did not agree to the amendment and restatement of the Initial Contracts or that it disputed any of the terms of the Excess Loss Policy or the amended and restated Administrative Services Contract.

11. The Stop Loss Contract, as amended and restated by the Excess Loss Policy, was designed to limit the losses Plaintiff might incur through its self-insured employee health benefits Plan.

12. The Administrative Services Contract, as amended and restated, constituted and governed Defendant's agreement to perform administrative services on behalf of Plaintiff in connection with the Plan, including the processing and payment of employee claims.

13.   One of the features of the Stop Loss Contract, as amended and restated by the Excess Loss Policy, was to credit Plaintiff for certain amounts during a policy year based on Plaintiff's claims experience during previous policy years. This feature was called the "Simple Funding Option" under the Excess Loss Policy (set forth on Rider D.5 to the Excess Loss Policy) and the "Payable Experience Surplus" under the Stop Loss Contract (set forth in the definitions of "Excess Surplus" and "Payable Experience Surplus" in "Article – Definitions" and in the second paragraph of "Article – Aggregate Stop-Loss Benefit" on page 4 of the Stop Loss Contract).

14.   The formula for calculating credits referred to in paragraph 11 hereinabove is the same under the Stop Loss Contract and the Excess Loss Policy.

15.   Both the Stop Loss Contract and the Excess Loss Policy provide that such audits would be performed and such credits (referred to as "payments" in the Stop Loss Contract) would be credited or paid only during years in which the contract or policy was in effect. *See* Stop Loss Contract, "Article – Aggregate Stop-Loss Benefit," second paragraph, p. 4 ("Ninety days after the end of the Contract Year, if the Contract is still in force, Alta will perform an accounting and pay the Contractholder the Payable Experience Surplus"); Excess Loss Policy, Rider D.5, paragraph B ("Ninety days after the end of each Policy Year, if this Policy is then in force, the Company will calculate the Experience Surplus, if any, and credit the Policyholder's accounting under this Policy with any positive Creditable Experience Surplus. Upon termination of this Policy, no amount will be credited to Policyholder's accounting under this Policy. The Creditable Experience Surplus shall not reduce, offset or otherwise alter any obligation of the Policyholder except to the extent specifically credited according to the section.").

16. The Contracts provide that upon termination, Plaintiff was obligated to pay certain termination fees due on the first day of the month in the two months subsequent to the termination date.

17. The termination fees consisted of the following:

   a. Two months of premiums due under the Excess Loss Policy; see Rider D.5, p. 2, amending "Article – Premium Provisions" ("[P]remiums are due on . . . the first day of the first two months following termination of this Policy").

   b. Two months of "Terminal Attachment" fees; see Excess Loss Policy, Article – Schedule, subsection F.; Article – Definitions, "Terminal Attachment Limit".

18. The termination fees under the Excess Loss Policy are equivalent to the termination fees under the Stop Loss Contract.

19. Under the Excess Loss Policy, expenses incurred by Plaintiff's covered employees and their dependents prior to the date of the Policy termination would be covered under the policy if submitted within 15 months, provided that all amounts due under the policy and the Administrative Services Contract were timely paid.

20. However, these termination fees are due and payable regardless of whether claims are submitted for payment subsequent to the termination of the policy. Excess Loss Policy, § 11, "Term and Termination", subsection H(4); Stop Loss Contract, "Article – Contract Termination," p. 6.

21. In late 2002, Plaintiff notified Defendant that it would not be renewing the Contracts effective December 31, 2002.

22. D.L. Ryan was responsible for terminal fees upon termination of the Contracts consisting of two months of premiums and two months (January and February of 2003) of terminal attachment fees.

23. After termination of the Contracts, Alta paid claims on behalf of D.L. Ryan submitted by D.L. Ryan employees for which Alta was not reimbursed.

24. In addition to the terminal fees and 2003 claims payments, D.L. Ryan was obligated to reimburse Alta for a premium undercharge for the month of January 2001.

25. D.L. Ryan had prepaid credits for a portion of the terminal fees based on payments made in connection with the Letter Agreement, but has failed and refused to pay the balance of $38,335.56 due to Alta despite demand.

26. D.L. Ryan breached the Contracts by its failure to reimburse or pay amounts due to Alta.

27. Section 6 of the amended and restated Administrative Services Contract provides that "the Contractholder [D.L. Ryan] will indemnify, protect and hold the Company harmless from any loss, liability, claim or expense (including attorney's fees, court costs and expenses of litigation) arising out of any act or omission of the Contractholder in connection with the Plan or in connection with this Contract."

28. Alta has sustained damages as a result of D.L. Ryan's breach of the Contracts, and claims $38,335.56 plus interest, costs and expenses of this action and attorneys' fees.

**COUNT TWO (Unjust Enrichment)**

1-3 Paragraphs 1-3 of Count One are realleged as paragraphs 1-3 of Count Two.

4. On or about January 29, 2000, D.L. Ryan signed and transmitted to Alta the following contracts:

      a.      A Stop-Loss Contract ("Stop-Loss Contract") (a copy is attached as Exhibit A); and

      b.      An Administrative Services Contract ("Initial Administrative Services Contract") (a copy is attached as Exhibit B).

The Stop-Loss Contract and the Initial Administrative Services Contract are referred to collectively, at times, hereinafter as the "Initial Contracts."

      5.      In connection with the Initial Contracts, Alta and D.L. Ryan entered into a letter agreement, dated April 10, 2000 (the "Letter Agreement"), regarding a "Premium Stabilization Reserve." The Letter Agreement concerned a reserve for terminal costs under the Initial Contracts, and provided, *inter alia*, that "[a]ll other provisions of the Stop Loss agreement are applicable to this agreement." A copy of the Letter Agreement is attached as Exhibit C.

      6.      D.L. Ryan accepted the benefits of the services and insurance coverage provided pursuant to the Initial Contracts and paid or reimbursed amounts to Alta due under the Initial Contracts.

      7.      On or about January 29, 2002, Alta signed and sent the following contracts to D.L. Ryan:

      a.      An Excess Loss Policy, which amended and restated the Stop Loss Contract (a copy is attached as Exhibit D); and

      b.      An Administrative Services Contract, which amended and restated the Initial Administrative Services Contract (a copy is attached as Exhibit E).

The Excess Loss Policy and the amended and restated Administrative Services Contract are referred to collectively, at times hereinafter, as the "Contracts."

8. The primary purpose of the amendment and restatement of these contracts was to update them to include new plan designs and clarify certain provisions. See January 29, 2002 cover letter transmitting the Contracts to Plaintiff (a copy is attached as Exhibit F).

9. The January 29, 2002 cover letter to Plaintiff provided that "your first payment will be considered your acceptance of these new contracts and policies."

10. During the balance of the calendar year 2002, after its receipt of the January 29, 2002 cover letter, Plaintiff continued to use and pay for Defendant's services pursuant to the Administrative Services Contract, as amended, and continued to benefit from and pay for insurance coverage provided by the Excess Loss Policy.

11. Plaintiff never indicated to Defendant that it did not agree to the amendment and restatement of the Initial Contracts or that it disputed any of the terms of the Excess Loss Policy or the amended and restated Administrative Services Contract.

12. The coverage provided under the Stop Loss Contract, as amended and restated by the Excess Loss Policy, was designed to limit the losses Plaintiff might incur through its self-insured employee health benefits Plan.

13. The administrative services performed by Alta on behalf of D.L. Ryan under the Administrative Services Contract, as amended and restated, included the processing and payment of employee claims.

14. One of the features of the Stop Loss Contract, as amended and restated by the Excess Loss Policy, was to credit Plaintiff for certain amounts during a policy year based on Plaintiff's claims experience during previous policy years. This feature was called the "Simple Funding Option" under the Excess Loss Policy (set forth on Rider D.5 to the Excess Loss Policy) and the "Payable Experience Surplus" under the Stop Loss Contract (set forth in

the definitions of "Excess Surplus" and "Payable Experience Surplus" in "Article – Definitions" and in the second paragraph of "Article – Aggregate Stop-Loss Benefit" on page 4 of the Stop Loss Contract).

15. The formula for calculating credits referred to in paragraph 11 hereinabove is the same under the Stop Loss Contract and the Excess Loss Policy.

16. Both the Stop Loss Contract and the Excess Loss Policy provide that such audits would be performed and such credits (referred to as "payments" in the Stop Loss Contract) would be credited or paid only during years in which the contract or policy was in effect. *See* Stop Loss Contract, "Article – Aggregate Stop-Loss Benefit," second paragraph, p. 4 ("Ninety days after the end of the Contract Year, if the Contract is still in force, Alta will perform an accounting and pay the Contractholder the Payable Experience Surplus"); Excess Loss Policy, Rider D.5, paragraph B ("Ninety days after the end of each Policy Year, if this Policy is then in force, the Company will calculate the Experience Surplus, if any, and credit the Policyholder's accounting under this Policy with any positive Creditable Experience Surplus. Upon termination of this Policy, no amount will be credited to Policyholder's accounting under this Policy. The Creditable Experience Surplus shall not reduce, offset or otherwise alter any obligation of the Policyholder except to the extent specifically credited according to the section.").

17. The Contracts provide that upon termination, Plaintiff was obligated to pay certain termination fees due on the first day of the month in the two months subsequent to the termination date.

18. The termination fees consisted of the following:

  a. Two months of premiums due under the Excess Loss Policy; see Rider D.5, p. 2, amending "Article – Premium Provisions" ("[P]remiums are due on . . . the first day of the first two months following termination of this Policy").

  b. Two months of "Terminal Attachment" fees; see Excess Loss Policy, Article – Schedule, subsection F.; Article – Definitions, "Terminal Attachment Limit".

 19. The termination fees under the Excess Loss Policy are equivalent to the termination fees under the Stop Loss Contract.

 20. Under the Excess Loss Policy, expenses incurred by Plaintiff's covered employees and their dependents prior to the date of the Policy termination would be covered under the policy if submitted within 15 months, provided that all amounts due under the policy and the Administrative Services Contract were timely paid.

 21. However, these termination fees are due and payable regardless of whether claims are submitted for payment subsequent to the termination of the policy. Excess Loss Policy, § 11, "Term and Termination", subsection H(4); Stop Loss Contract, "Article – Contract Termination," p. 6.

 22. In late 2002, Plaintiff notified Defendant that it would not be renewing the Contracts effective December 31, 2002.

 23. D.L. Ryan was responsible for terminal fees upon termination of the Contracts consisting of two months of premiums and two months (January and February of 2003) of terminal attachment fees.

 24. After termination of D.L. Ryan's coverage under the Contracts, Alta paid claims on behalf of D.L. Ryan submitted by D.L. Ryan employees for which Alta was not reimbursed.

25. In addition to the terminal fees and 2003 claims payments, D.L. Ryan was obligated to reimburse Alta for a premium undercharge for the month of January 2001.

26. D.L. Ryan had prepaid credits for a portion of the terminal fees based on payments made in connection with the Letter Agreement, but has failed and refused to pay the balance of $38,335.56 due to Alta despite demand.

27. During the period from January 1, 2000 through December 31, 2002, D.L. Ryan benefited from the administrative services provided by Alta on D.L Ryan's behalf and the Stop Loss and/or Excess Loss insurance provided by Alta.

28. It would be inequitable and D.L. Ryan would be unjustly enriched if it were able to utilize and retain these benefits provided by Alta without paying the amounts due to Alta in accordance with the terms of the Contracts and/or the Initial Contracts.

29. Alta therefore seeks reimbursement from D.L. Ryan in the total amount of $38,335.56.

WHEREFORE, Plaintiff-in-Counterclaim Alta seeks the following relief:

As to Count One:

1. Damages;

2. Costs and expenses of this action;

3. Attorneys fees; and

4. Such other equitable or legal relief as this Court deems just and appropriate.

As to Count Two:

1. Reimburse of amounts by which D.L. Ryan would otherwise be unjustly enriched;

2. Costs; and

3. Such other equitable or legal relief as this Court deems just and appropriate.

Respectfully Submitted,

*[signature]*

Marie A. Casper (ct#08974)

ZELDES, NEEDLE & COOPER
A Professional Corporation
1000 Lafayette Boulevard
P.O. Box 1740
Bridgeport, Connecticut 06601-1740
Tel.: 203-333-9441
Fax: 203-333-1489
E-Mail: mcasper@znclaw.com

Attorneys for Defendant
Alta Health & Life Insurance Company

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent via first class U.S. Mail, postage prepaid, to the following parties of record:

Mark J. Kovack, Esq.
Wake, See, Dimes & Bryniczka
27 Imperial Avenue
P.O. Box 777
Westport, CT 06881-0777
Ph. 203-227-9545

Attorneys for Plaintiff
D.L. Ryan Companies, Ltd.

Dated at Bridgeport, Connecticut this 21st day of April 2004.

_____
Marie A. Casper